Filed 8/5/14  In re J.C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | B252397 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK32884) |
|      Plaintiff and Respondent, | |
|      v. | |
| D.C., | |
|      Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carlos Vasquez, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

D.C. (father) appeals from the order terminating his parental rights to his son, J.C. He argues the juvenile court erred in not applying the "benefit exception" to termination of parental rights. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] We find no error and affirm the order.

## FACTUAL AND PROCEDURAL SUMMARY

This matter first came to the attention of the Department of Children and Family Services (DCFS) on February 6, 2012, when father called the Child Protection Hotline. Father stated that C.C.[2] (mother) had hit him the day before in the presence of J.C., their eight-month-old son. Father also claimed that mother was verbally abusive, is bipolar, and is often noncompliant with her medication. Father was diagnosed with depression in 2007, but unlike mother, he was compliant with his medication. He also consistently attended outpatient treatment for his mental condition.

A social worker surveyed the apartment where J.C., mother, and father were residing and found dog feces and cockroaches throughout the residence. Father told the social worker that he would like to have primary custody of J.C. He wanted to take J.C. to San Diego to live with his niece (M.N.) and himself. Father had a paralyzed left arm and needed help from M.N. to take care of J.C. On a social worker's subsequent visit to the apartment, father stated that J.C. had been staying with M.N. The social worker reported that "[i]t was clear that . . . father has chosen to prioritize his relationship with mother over caring for his child."

The social worker also spoke with M.N., who said that she did not think father could take complete care of J.C., and that father and J.C. were "welcome to stay in her home for as long as needed." Father later consented to DCFS placing J.C. with M.N. until he could find safe housing for J.C. and himself and develop a stable plan to care for J.C.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] C.C. is not a party to this appeal and will only be mentioned as necessary.

2

In February 2012, DCFS filed a Welfare and Institutions Code section 300 petition on behalf of J.C. At the detention hearing, father was declared J.C.'s presumed father. The court issued a mutual stay-away order, in which mother and father were ordered to stay at least 100 yards away from each other. They were forbidden to contact each other. The court ordered that because mother was the owner or renter of the apartment father shared with her, father was to move out of the apartment. J.C. was not released to father, as father was still residing with mother. Instead, the court ordered J.C. detained with M.N., and father was permitted overnight unmonitored visits. Father also was to be provided with referrals for counseling and domestic abuse counseling, at low or no cost.

At the jurisdiction and disposition hearing in April 2012, the court declared J.C. a dependent of the court. The court sustained two counts in regards to mother: (1) mother is periodically unable to provide J.C. with necessary care and supervision; and (2) domestic altercations between mother and father placed J.C. at risk of harm. The court ordered family reunification services for father, which included individual counseling with a DCFS approved counselor, medication compliance, and psychiatric counseling. Father was still not to visit with mother, and he was still permitted unmonitored visitation, including overnight visits, with J.C. at M.N.'s home.

In October 2012, DCFS recommended that reunification services be terminated, and that a permanent plan of adoption be instituted. According to M.N., father had visited J.C. only four times since April 4, 2012, when the court permitted unmonitored overnight visitations. Because of father's disabilities, when he did visit he was unable to dress, change, or chase after J.C. M.N. also stated that J.C. would cry during father's visits, though father denied this claim. The social worker reported that father had continued his relationship with mother despite the stay away order and the social worker's repeated statements to father that this could jeopardize reunification with J.C.

In March 2013, DCFS reported that J.C. had moved in with new caregivers, as M.N. was no longer able to provide for him. Father was no longer participating in therapy and had not visited J.C. since the previous December.

During a May 2013 hearing, the court terminated father's reunification services because he had ceased regular visitation with J.C. and had not shown that he could provide his son with a safe environment. The court found that there was no substantial probability that J.C. would be returned within the next six months, and that the goal for J.C. should be adoption or legal guardianship. Father was permitted four unmonitored visits with J.C. per month, including a visit on J.C.'s birthday.

In September 2013, DCFS submitted a report asking the court to terminate parental rights and order adoption as the permanent plan. DCFS stated that it was highly likely that the caregivers would adopt J.C. According to a DCFS report on October 10, the same day as the 366.26 hearing, father had visited J.C. only five times since May 23, 2013. Father stated that it was difficult to get to the caregivers' residence more often than that because he had moved to San Jacinto and the caregivers lived in Los Angeles County. The caregivers offered to drop off and pick up J.C. at a location between their residence and father's residence. Father scheduled and cancelled five visits during that period, including the court-ordered visit on J.C.'s birthday, as to which he said he would be out of town. On other occasions, father cancelled visits because, he said, he did not have transportation and because he had missed the train. Father claimed to visit J.C. "every chance he gets." The DCFS report stated that father could not take care of J.C. during the four-hour visits, and that when he returned J.C. to the caregivers' residence, J.C.'s clothes and ankles were covered in feces as a result of father's inability to clean him.

On October 10, 2013, the court held a contested 366.26 hearing to determine whether to terminate father's rights and to institute a permanent plan. Father argued that the benefit exception to adoption should apply because, through regular visitation, J.C. had developed a beneficial bond with father, and the strength of that bond should prevent termination of parental rights. Father testified that he had visited J.C. three times in the previous month, each time for about four hours, and that J.C. was happy whenever father came to visit, but would cry whenever father had to leave. Father claimed he could not visit J.C. more often because of the distance and his own financial constraints. The court

received two letters written on behalf of father. The letters stated that father "loves his son" and "wants to be a part of his son's life forever."

Both DCFS and J.C.'s counsel advocated adoption as the permanent plan. The court found it would be detrimental for J.C. to be returned to father and that there was clear and convincing evidence that J.C. was likely to be adopted. The court did not find a compelling reason to apply the benefit exception to adoption because father had not maintained regular visitation with J.C., nor would J.C. benefit from a continued relationship with him.

The court terminated father's rights and transferred custody to DCFS for adoptive planning and placement. It designated the caregivers as the prospective adoptive parents. Father filed a timely appeal.

## DISCUSSION

### I

Father and DCFS disagree about the applicable standard of review. Father argues that we should apply the substantial evidence standard, but DCFS argues that we should apply a composite standard of substantial evidence and abuse of discretion.

Reviewing courts have varied in their application of a standard of review. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [reviewing trial court's order for abuse of discretion]; contra *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207 [reviewing trial court's order for sufficiency of evidence].) However, "[t]he practical differences between the two standards of review are not significant." (*Jasmine D.*, at p. 1351.) Broad deference must be granted to the juvenile court under both. (*Ibid.*) A reviewing court should interfere with the court's findings only if it concludes that, "'"under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did."'" (*Ibid.*)

5

The only issue on appeal is whether the lower court erred in refusing to apply the benefit exception to adoption. Where, as here, "the court finds that a child may not be returned to his or her parent and is likely to be adopted, it must select adoption as the permanent plan unless it finds that termination of parental rights would be detrimental to the child under one of four specified exceptions." (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The benefit exception, one of these four exceptions, applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) A compelling reason may be found where: (1) the parent maintained regular visitation and contact with the child; and (2) the child would benefit from continuing the relationship. (*Ibid*.) The parent has the burden to show that the benefit exception applies. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.)

*A. Regular Visitation*

Sporadic visitation does not satisfy the first prong of the benefit exception. (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) In *In re C.F.* (2011) 193 Cal.App.4th 549, 554 (*C.F.*), the court determined that the mother's overall visitation with the minor child was sporadic and did not constitute regular visitation. (*Ibid.*) Though the mother visited the minor regularly in the month leading up to the 366.26 hearing, during an earlier three-month span, she had visited just three times. (*Ibid.*) "[She] attributed the lack of visitation to a lack of money." (*Ibid.*)

Here, father visited less regularly than the mother in *C.F.*, *supra*, 193 Cal.App.4th 549. Between April 4, 2012 and October 4, 2012, he visited J.C. only four times even though he was permitted overnight visits at M.N.'s residence. Between December 2012 and March 2013, father did not visit J.C. at all. Although the mother in *C.F.* made regular visits leading up to the 366.26 hearing, in the five months leading up to father's 366.26 hearing, he visited J.C. only five times, even though he was permitted four visits per month. He scheduled and cancelled five visits during that period. As in *C.F.*, father also stated that his lack of visitation was partly due to financial constraints. The mother's

financial constraints in *C.F.* did not change the outcome of the appeal; the appellate court affirmed termination of parental rights because the visitation was still determined to have been sporadic.  Father also argued that his lack of visitation was due to distance between his residence and the residence of the caregivers.  However, father's visitation was sporadic even before J.C. moved to Los Angeles County; he visited only four times during a six-month period in which J.C. was living with M.N.  In addition, the caregivers agreed to meet father between their respective residences, yet father still failed to avail himself of many of the visits that he was permitted.

Father argues the court must consider the amount of visitation the parent was allowed before determining that the visitation was irregular.  For this proposition, he cites *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537–1538.)  In that case, the court did not terminate parental rights because mother visited her minor children "for the entire lengthy period of this dependency case, to the extent permitted by the court's orders." (*Id.* at p. 1537)  As we have discussed here, father did not visit to the extent permitted by court order.  On this record, it was reasonable to conclude that father had not regularly visited J.C.

*B. Benefit to the Child from Continuing the Relationship*

To qualify for the benefit exception, father would also would have to show that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (See *Autumn H* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)  The factors to be examined for this determination include the age of the child and the portion of the child's life spent in the parent's custody.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467–468 *(Angel B)* [affirming order terminating parental rights partly because daughter was very young at the time of the 366.26 hearing and had spent far more time with her foster family than with her mother].)  "[I]nteraction between the natural parent and child will always confer some incidental benefit to the child."  (*In re Autumn H.*, *supra*, at p. 575.)  But to satisfy this prong of the benefit exception, the parent must establish that he or she has a parent-child relationship with the minor, which typically "arises from day-

7

to-day interaction, companionship, and shared experiences. [Citation.]" (*Ibid.*) Additionally, the parent must show the child would suffer detriment if the parents' rights were terminated. (*Ibid.*)

In *Autumn H., supra,* 27 Cal.App.4th 567, even though the father's bi-monthly visits conferred an incidental benefit to his child, the court still terminated parental rights because termination would not cause a detriment to the child. (*Autumn H.,* at p. 576.) During visitations, the father would play with his child for about an hour; his relationship to his child was that of a "friendly visitor" rather than a parent. (*Ibid.*)

Father claims J.C. was happy whenever he came to visit, that he would take J.C. to the park, and that J.C. was sad when father had to leave. Intermittently taking a child to the park is not sufficient to establish the type of parent-child relationship that *Autumn H., supra,* 27 Cal.App.4th 567 prescribes. Though father's aunt and father's friend wrote letters explaining that he was a good father, neither letter addressed whether a continued relationship would be good for J.C. The caregivers stated that when J.C. returned from a visit with father, he was covered with food, his diaper had not been cleaned, and he had dark urine the next day.

As in *Angel B, supra,* 97 Cal.App.4th 454, J.C. is very young and has spent most of his life outside of his father's custody. He was eight months old at the time of the initial detention, and he is now three years old. M.N. stated that J.C. did not even acknowledge father when he came to visit. The caregivers claimed that J.C. gets upset and cries when left with father. J.C.'s young age and the long period of time he has lived without a permanent home indicate that J.C. would benefit from adoption more than he would benefit from a continued relationship with father. (See *id.* at pp. 467–468.)

The evidence presented by M.N., the caregivers, and DCFS supports the conclusion that father has not met his burden of showing that J.C. would suffer detriment from a discontinuation of the relationship, nor a benefit from its continuation. Viewed most favorably to the trial court's order, the evidence shows that the court did not err when it determined that there was not a compelling reason to select an alternative to adoption. Therefore, we affirm the trial court's order.

8

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


MANELLA, J.

9